# EXHIBIT A

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
IN AND FOR ORANGE COUNTY, FLORIDA
(*CIVIL DIVISION*)

| | |
|---|---|
| WESTLAKE FLOORING COMPANY, LLC, a California limited liability company;<br><br>Plaintiff,<br><br>vs.<br><br>UNIVERSAL AUTO PLAZA, INC., a Florida Corporation; MEHRNOOSH SABETI SANAT, an individual; NEXTGEAR CAPITAL, INC.; CORPORATION SERVICE COMPANY; FLOORPLAN XPRESS, LLC-OK;<br><br>Defendants.<br>_____/ | CASE NO. 2016-CA-010362-O<br><br>DIV. 39 |

## **FINAL JUDGMENT**

**THIS CAUSE** came before the Court upon a bench trial on October 17, 2022, on Plaintiff Westlake Flooring Company, LLC's ("Westlake") Third Amended Complaint dated December 1, 2017, and Defendants Universal Auto Plaza, Inc. ("Universal") and Mehrnoosh Sabeti Sanat's ("Sanat") Amended Answer, Affirmative Defenses, and Counterclaim dated January 5, 2018. Having reviewed the evidence, the parties' submissions and hearing argument from counsel, the Court finds in favor Westlake for the reasons below.

**I.    Findings of Fact**

Westlake is a floorplan financing company engaged in the business of loaning money to automobile dealerships. Universal was an automobile dealership that conducted business in Orange County, Florida, during the relevant time frame. Sanat owned Universal.

On July 18, 2014, Universal entered into a Loan and Security Agreement ("LSA") with Westlake under which Westlake would lend money to Universal to purchase automobiles for its

CASE NO. 2016-CA-010362-O
DIV. 39

inventory and Universal would repay the loan pursuant to the LSA's terms. Westlake's Ex. 1, § 2.

More specifically, Section 2(c) required Universal to repay the advances as follows:

> (c) <u>Repayment of Advances</u>. Each Advance, from time to time as necessary on or after the Agreement Date, for the purchase of a Vehicle shall be payable in full on the earliest of :
>
>     i.  seven (7) days after the date of the Vehicle sale, if financed, or within twenty-four (24) hours after the date Borrower receives payment by or on behalf of the purchaser of such Vehicle, whichever occurs first; or
>
>     ii.  the Maturity Date of such Advance; or
>
>     iii.  the termination of this Agreement.
>
> In addition, payments of principal shall be made in accordance with the Advance/Fee Scheduled . . .

*Id.* § 2(c).

Section 3 of the LSA discloses the amount of interest on the advances, the date the interest begins to accrue on each advance, and the fees Universal was required to pay in connection with each advance. LSA's Section 5 sets forth the collateral Universal pledged as security for repayment. Section 5(a) states in part:

> (a) <u>Pledge of Collateral</u>. For the purpose of securing the Loans, or any other indebtedness of Borrower or any Guarantor to Lender, Borrower hereby grants Lender a security interest in all of Borrower' assets and properties, now owned and hereinafter acquired, wherever located, including all Vehicles, inventory, parts and accessories inventory, equipment, goods, fixtures, accounts, deposit accounts, accounts receivable, holdback reserves, manufacturer rebates and incentive payment, payment intangibles, instruments commercial tort claims, letter of credit rights, investment property, securities and securities accounts, and general intangibles of Borrower; any cash, money, or other property of Borrower in the possession, custody or control of Lender; all accessions to, substitutions for, and all replacements of any of the foregoing; all books and records of Borrower related to any of the foregoing including, without limitation, computer programs, print-outs, and other computer hardware and software materials and records pertaining to any of the foregoing; together with all proceeds and products of the

> foregoing, including without limitation, proceeds of insurance policies insuring any of the foregoing (collectively, "Collateral"). The security interest granted in this Agreement is in additional to and not in substitution of any right of offset, netting, or reclamation that Lender may have against Borrower pursuant to any contact or applicable. Law.

*Id.* § 5(a).

Section 6 of the LSA imposed several duties on Universal in it use and protection of the Collateral, which included to (1) protect and secure the Vehicles and other Collateral; (2) not impair the value of the Vehicles or other Collateral; (3) keep the Vehicles and Collateral free of taxes, liens, or encumbrances, and any sums which may be paid by Lender; and (4) notify Lender if any Vehicle is not located at Universal's designated place of business for more than 24 hours.

Section 10(c) requires Universal to "obtain and maintain all licenses and permits necessary for it to purchase and sell Vehicles (and receive proceeds) . . ." Section 12 provides that Westlake shall have no obligation to make any loans or advances pursuant to the LSA's terms until certain conditions precedent were met and continue to be satisfied. These conditions precedent include (1) no action, proceeding, or investigation, shall have been instituted before any governmental agency to enjoin, restrain, or prohibit actions that are related to, or arise from, the LSA; and (2) no material adverse changes in Universal's financial condition, results of operations, businesses, or prospect, or any event which could material adversely affect Universal's financial condition.

Section 13 sets forth the events for automatic termination of the LSA, which include:

> (a) Upon the occurrence of an Event of Default or a default under any other Agreement with, or guaranty, to Lender;
>
> . . .
>
> (c) If Lender, in its sole discretion, determines that future financing for Borrower is no justified due to a material adverse change in Borrower's financial condition, business, business prospects, ability to repay the Loans or in the Collateral . . .

CASE NO. 2016-CA-010362-O
DIV. 39

Ex. 1, § 13.

> Section 14, which identifies the Events of Default, states:
>
>> An "Event of Default" shall include the following: (a) a default by Borrower in the payment or performance of any obligation or promise under this Agreement or any other agreement with, or guaranty to, Lender; (b) any representation for warranty, whether made in or pursuant to this Agreement or any other obligation or debt to Lender, is found to be untrue; ... (e) Borrower is or becomes unable to pay its debts as such debts become due; (f) a default by any Guarantor in the payment or performance of any obligation under a Guaranty; ... (i) the Lender shall deem itself insecure. Time is of the essence in the performance of all obligations of Borrower under the Loan Documents. The parties agree that Lender's charging of a Vehicle Not Found Fee or Sold Out of Trust Fee shall not constitute a waiver of any rights of Lender under this Agreement.

Ex. 1, § 14.

> Section 16, which sets forth Westlake's rights and remedies upon default, provides:
>
>> Upon the occurrence of an Event of Default or if Vehicles or other Collateral are in danger of misuse, loss, seizure or confiscation, Lender may, in its discretion, accelerate the entire outstanding amount due from Borrower under this Agreement and may take immediate possession of Vehicles or other Collateral without demand or further notice and without legal process. . . . Lender shall have the right, and Borrower hereby authorizes and empowers Lender, to enter upon the premises wherever Vehicles and other Collateral may be and remove same. Borrower shall pay all expenses and reimburse Lender for any expenditures, including reasonable attorneys' fees and legal expenses . . . in connection with (i) Lender's exercise or defense of any of its rights and remedies under this Agreement . . .

Ex. 1, § 16.

> Section 18 states:
>
>> **DAMAGE WAIVER. IN NO EVENT WILL LENDER OR ANY OTHER INDEMNIFIED PERSON BE LIABLE TO BORROWER FOR ANY SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES, INCLUDING, WITHOUT LIMITATION, LOST PROFITS, WHETHER BASED ON BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, WHETHER OR NOT**

4

> **LENDER OR SUCH OTHER INDEMNIFIED PERSON HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND IN NO EVENT WILL LENDER OR ANY OTHER INDEMNIFIED PERSON BE LIABLE TO BORROWER FOR DAMAGES IN EXCESS OF THE SUMS PAID BY BORROWER TO LENDER UNDER THIS AGREEMENT.**

Ex. 1, § 18.

Universal executed a Promissory Note in the amount of $200,000.00 and an Amended and Restated Promissory Note in the Amount of $250,000. Westlake's Ex. 1. The Promissory Notes provides for 4.5% interest for all advances made pursuant to the LSA. The Promissory Notes further state:

> Any advance for a Vehicle shall be payable on the earliest of:
>
> (i)   seven (7) days after the date of the Vehicle sale, if financed, or within twenty-four (24) hours after the date Borrower receives payment by on or on behalf of the purchaser of such Vehicle, which occurs first;
> (ii)  the Maturity Date (as defined below) for such Advance; or
> (iii) the termination of the Agreement.
>
> In addition, payments of principal shall be made in accordance with the Advance/Fee Schedule. The "Maturity Date" for the Advance shall mean the date upon which the Advance is to be repaid as set forth in the Agreement; ….

Ex. 3 at 2.

On July 18, 2014, Sanat executed a Personal Guaranty in favor of Westlake in which she absolutely and unconditionally guaranteed payment of Universal's indebtedness. Westlake's Ex. 1. Paragraph 2 of the Guaranty states, in part:

> Each Guarantor, absolutely, unconditionally, and without limit, guarantees and becomes surety for the full, prompt and punctual payment to WESTLAKE, as and when due, whether at maturity, by acceleration or otherwise, of any and all indebtedness, and performance of any and all liabilities and obligations of Borrowers to WESTLAKE created at any time under, or pursuant to the terms

5

of the [July 18 LSA] and of the [July 18 Promissory Note] issued by Borrower[] . . . in favor of WESTLAKE. . . .

Paragraph 3(a) of the Guaranty states, in pertinent part, as follows:

(a) The obligations and liability of the Guarantors under this [July 18 Personal Guaranty] shall be independent, joint and several, absolute, primary and direct, irrevocable and unconditional, regardless of any non-perfection of any collateral security for the Obligations. . . .

Paragraph 4(b) of the Guaranty states, in pertinent part, as follows:

If any Obligation or Expense is not paid or performed by the Borrowers punctually, subject to any applicable grace period, including without limitation any Obligation due by acceleration of the maturity thereof, Guarantor[] will, upon WESTLAKE'S demand, without duplication, immediately pay or perform such obligation or Expense or cause the same to be paid or performed. . .

On July 28, 2014, Westlake recorded a UCC-1 Financing Statement with the Florida Secured Transaction Registry as transaction number 201401896438, against Universal's assets. Westlake's Ex. 4. Thereafter, Universal used Westlake's floorplan line of credit to purchase vehicles into its inventory. Westlake's Ex. 5.

In October 2016, the Florida Department of Highway Safety and Motor Vehicles ("DMV") filed an administrative complaint ("DMV Complaint") against Universal. Westlake's Ex. 24. The DMV Complaint consisted of 86 counts of statutory and administrative rule violations, including, Universal's failure to submit paperwork to transfer title to sold vehicles within 30 days, failure to provide title or proof of ownership of vehicles to DMV's compliance examiner, and failure to provide records of pre-printed tags to DMV's compliance examiner. *Id.* The DMV Complaint sought to revoke Universal's license. *Id.*

From November 17, 2016, through November 22, 2016, over 30 payments from Universal to Westlake were rejected for insufficient funds in Universal's bank account. Westlake's Ex. 5. On November 22, 2016, Floorplan Xpress, another floorplan company with which Universal financed

the purchase of vehicles into its inventory, notified Westlake that it would be "closing down" Universal and repossessing its collateral from Universal as a result of a default on its floorplan line of credit. Floorplan Xpress appeared at Universal's lot and repossessed vehicles it financed due to Universal's default. As a result of these events of default, Westlake declared Universal in breach of the loan documents and accelerated the amounts due pursuant to the LSA and Promissory Note. Further, Westlake deemed itself insecure, and exercised its right to repossess the Vehicles on Universal's lot. On November 22, 2016, Westlake began to repossess its vehicles on Universal's lot pursuant to its LSA rights, but Universal stopped Westlake and had the police order Westlake from the premises.

On November 26, 2016, Westlake filed this action to enforce its rights under the LSA, Promissory Note, and Personal Guaranty. On November 28, 2016, Westlake's audit of Universal's inventory showed that 66 out of 69 vehicles it financed were missing from Universal's lot. On December 28, 2016, Westlake returned to Universal's lot and repossessed approximately 60 vehicles on the lot. Westlake subsequently sold the vehicles at auction and all the proceeds from the sales were credited to Universal's balance. Westlake's Ex. 5. Prior to selling the vehicles, Westlake sent Universal two Notice of Sale advising of its intent to sell the vehicles it repossessed. Westlake's Ex. 10. After all auction sales credits and payments, Universal owes Westlake $337,336.60.

On January 24, 2017, the DMV entered its Amended Final Order revoking Universal's license effective immediately and ordering it to surrender the license, any companion licenses, and all dealer and temporary tags in its possession. Westlake's Ex. 25.

CASE NO. 2016-CA-010362-O
DIV. 39

## II. Conclusions of Law: Westlake's Causes of Action

### A. Breach of Contract and Breach of Promissory Note

Westlake's claims for breach of contract and breach of promissory note are similar as the elements of these causes of action are essentially similar. Westlake must show "(1) a valid contract; (2) a material breach; and (3) damages." *Abbot Labs, Inc., v. Gen. Elec. Capital*, 765 So. 2d 737, 740. (Fla. 5th DCA 2000); *see also Mettler, Inc., v. Ellen Tracy, Inc.*, 648 So. 2d 253, 255 (Fla. 2nd DCA 1994); *Abruzzo v. Haller*, 603 So. 2d 1338 (Fla. 1st DCA 1992). "The basic elements of an enforceable contract are offer, acceptance, consideration, and sufficient specification of essential terms." *Jericho All-Whether Opportunity Fund, LP v. Pier Seventeen Marina & Yacht Club*, 207 So. 3d 938, 941 (Fla. 4th DCA 2016); *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004); *W. Constr., Inc. v. Fla. Blacktop, Inc.*, 88 So. 3d 301, 304 (Fla. 4th DCA 2012). "To maintain an action for breach of contract, a claimant must first establish performance on the claimant's part of the contractual obligations imposed by the contract." *Marshall Constr., Ltd., v. Coastal Sheet Metal & Roofing, Inc.* 559 So. 2d 845, 848 (Fla. 1st DCA 1990).

Westlake introduced the LSA and all of its exhibits and amendments into evidence as Exhibit 1. There is no dispute that the LSA is a valid contract between the parties. Westlake's witnesses, Jay Faunce ("Faunce") and Jennifer Fiore ("Fiore"), testified Westlake performed the LSA's obligations by advancing monies to Universal for its purchase of inventory. Faunce testified Universal was not a troubled account for the first two years. The testimony also reflects that between November 17, 2016, and November 22, 2016, over 30 ACH transactions Westlake initiated for interest and fees owed by Universal were rejected by its bank due to insufficient funds.

Faunce testified his former colleague from Floorplan Xpress, Deandra Callaghan, called him as a courtesy to advise that Floorplan Xpress terminated Universal's account and were on its way to repossess its vehicles. Faunce further testified he advised Nelda Chandler from Westlake's

8

main office about this development, and Westlake made the decision to repossess its vehicles as well. Westlake also offered the testimony of Floorplan Xpress representative Nicolette Christianson, who testified Universal breached its agreement due to non-payment, canceled its floorplan, and exercised its right to repossess its vehicles. These events demonstrate material breaches of the LSA's terms and Universal's default thereunder.

The DMV's institution of its administrative action and filing the DMV Complaint in October 2016 also constituted a material breach of the LSA. However, the other breaches identified above warrant are sufficient to find a material breach of the LSA even apart from the administrative action and filing of the complaint.

Westlake's loan payment history, entered into evidence as Exhibit 5, shows Universal owes damages to Westlake in the amount of $337,366.60, which includes all principal, interest, dealer fees, credits for payments Universal made, and application of all proceeds from Westlake's sale of the vehicles it recovered from Universal at auction.

Based on the foregoing, the Court concludes Westlake has proven Universal breached the LSA by a preponderance of the evidence, causing Westlake damages in the amount of $337,366.60.

### B.     Breach of Personal Guaranty

Westlake introduced into evidence, as Exhibit 2, the Personal Guaranty executed by Sanat on July 18, 2014, under which she personally, absolutely, and unconditionally guaranteed to satisfy the obligations of Universal. "Where the guaranty is absolute, the guarantor becomes liable upon non-payment by the principal, and the person in whose favor the guaranty runs has no duty to first pursue the principal before resorting to the guarantors." *Anderson v. Trade Winds Enters. Corp.*, 241 So. 2d 174, 177 (Fla. 4th DCA 1970); *Scott v. City of Tampa*, 30 So. 2d 300, 302 (Fla. 1947); *A&T Motors, Inc., v. Roemelmeyer*, 158 So. 2d 567 (Fla. 3d DCA 1964); *Quarngesser v. Appliance*

CASE NO. 2016-CA-010362-O
DIV. 39

*Buyers Credit Corp.*, 187 So. 2d 662, 665 (Fla. 3d DCA 1966). "[A] continuing guaranty remains in effect until revoked." *Causeway Lumber Co., v. King*, 502 So. 2d 80, 81 (Fla. 4th DCA 1987) (citing *Brann v. Flagship Bank of Pinellas, N.A.*, 450 So. 2d 237 (Fla. 2d DCA 1984). "It is said to be continuing in nature if it contemplates a future course of dealing during an indefinite period, or if it is intended to cover a series of transactions or succession of credits, or if its purpose is to give the principal-debtor a standing credit to be used by it from time to time." *Fid. Nat'l Bank v. Melo*, 366 So. 2d 1218, 1221 (Fla. 3d DCA 1979) (citing *Fewox v. Tallahassee Bank & Tr. Co.*, 249 So. 2d 55 (Fla. 1st DCA 1971). "The general rule is that a guarantee, such as we have here, when dealing with a continuing contract of guaranty, does not have a legal duty to give notice to the guarantors thereon of each transaction between the principal-debtor and the guarantee, provided that the particular transactions fall within the description of the course of dealings contemplated by the terms and conditions of the continuing guaranty." *Id.*

The Personal Guaranty states, in pertinent part, as follows:

> 3. Nature and Term of Guaranty
>
> (a) The obligations and liability of the Guarantor[] under this [July 18 Personal Guaranty shall be independent, joint and several, absolute, primary and direct, irrevocable and unconditional, regardless of any non-perfection of any collateral security for the Obligations . . .
>
> (c) This [July 18 Personal Guaranty] is a continuing guaranty and shall remain in full force and effect until the Obligations, the Expenses and any and all other amounts payable hereunder shall have been paid in full and no further loans or advances are available under the Loan Agreement and the period during which any payment by Borrowers or Guarantors is or may be subject to rescission, avoidance or refund under the Bankruptcy Code (or any similar state statute) shall have expired.

Ex. 2, § 3.

CASE NO. 2016-CA-010362-O
DIV. 39

Pursuant to the Personal Guaranty's terms, Sanat's obligations to Westlake are continuing, absolute, irrevocable, and unconditional. Sanat is required to satisfy Universal's obligations, which includes the amount of $377,366.60, now due and owing. Westlake's Ex. 5. Fiore testified that neither Universal nor Sanat has satisfied this balance that remains outstanding. Westlake has proven by a preponderance of the evidence that Sanat failed to satisfy her Personal Guaranty obligations, materially breached the Personal Guaranty, and as a result Westlake suffered damages in the amount of $337,366.60.

### III. Conclusions of Law: Defendants' Affirmative Defenses

Defendants only have two remaining defenses. The Court's December 10, 2021 Order Granting in Part Westlake's Motion for Summary Judgment struck Defendants' first, second, and fifth affirmative defenses.

#### A. Defendants' Third Affirmative Defense

Defendants allege that Westlake violated Section 671.208, *Florida Statutes*, which requires a creditor to accelerate as a result of deeming itself insecure only if she or he in good faith believes that the prospect of payment or performance is impaired. The burden of establishing the creditor's lack of good faith is placed by the statute upon the debtor. *Quest v. Barnett Bank of Pensacola*, 397 So. 2d 1020, 1021 (Fla. 1st DCA 1981) (holding that the burden imposed upon the debtor was "to introduce substantial evidence of lack of good faith"). Universal's only witness, Alireza Assadi ("Assadi"), testified that Westlake breached the LSA by wrongfully declaring Universal in default because it made all of its payments. Universal offered no other evidence, documentary or testimonial, to support his statements. Universal did not offer into evidence any bank statements, cashed checks, proof of wire transfer, or ACH transactions that contradicted Westlake's payment history. Universal offered no independent testimony or other corroboration that it remitted all payments prior to Westlake declaring it in default.

11

Even if the this Court were to credit Assadi's testimony, the evidence at trial convincingly supported that Westlake rightfully deemed itself insecure because multiple vehicles it financed were sold by Universal out of trust, the vehicles financed by Westlake were missing, Universal defaulted under its financing agreement with another floorplan lender, numerous ACH payments were return for insufficient funds and Universal's dealership license was in jeopardy of being revoked at the time Westlake filed suit. All of these occurrences happened within days of each other and Universal provided no evidence to call these events of default into question. Accordingly, the Court concludes that Universal has failed to meet its burden by a preponderance of the evidence.

### B. Defendants' Fourth Affirmative Defense

Defendants allege that Westlake wrongfully repossessed vehicles from its lot resulting in an inability to perform under the loan documents. Pursuant to section 16 of the LSA, Universal agreed to the following remedy in the event of default:

> Upon the occurrence of an Event of Default or if Vehicles or other Collateral are in danger of misuse, loss, seizure, or confiscation, [Westlake] may, in its discretion, accelerate the entire outstanding amount due from [Universal] under this Agreement and may take immediate possession of Vehicles or other Collateral without demand or further notice and without legal process.

By the time Westlake repossessed the vehicles from Universal's lot, Universal was in breach of the LSA and had triggered multiple events of default resulting in the repossession of its dealership lot. Westlake's repossession was permitted under the express terms of the loan documents. Accordingly, the Court concludes Universal has failed to carry its burden of providing this defense by a preponderance of evidence, or by substantial, competent evidence.

CASE NO. 2016-CA-010362-O
DIV. 39

## IV. Conclusions of Law: UNIVERSAL's Counterclaims

In its counterclaims, Universal claims that Westlake breached the terms of the LSA by wrongfully accelerating the indebtedness owed and wrongfully converted vehicles from Universal's dealership inventory. Universal claims that that the parties established a course of dealing where Westlake would routinely provide extensions for payments to be made on advances made under the floorplan and charge fees. The Court finds that Universal has failed to establish its counterclaims by a preponderance of the evidence.

Even accepting the allegations in the counterclaim, however, Universal has not put on evidence to rebut the multiple other breaches under the LSA, including failing to pay Westlake within the specified times after selling vehicles, failing to pay its debts under Floorplan Xpress' floorplan, failing to maintain the vehicles financed by Westlake on the dealer lot, and engaging in conduct jeopardizing Universal's dealer license. Moreover, paragraph 14 the LSA provides that Westlake's charging of a fee shall not constitute waiver of any rights of under the agreement in an event of default.

Additionally, Universal's conversion claim fails because Westlake exercised its right to repossess the vehicles after Universal defaulted. "Conversion occurs when a person asserts a right of dominion over chattel which is inconsistent with the right of the owner and deprives the owner of the right of possession." *Spradley v. Spradley*, 213 So. 3d 1042, 1044 (Fla. 2d DCA 2017). "Conversion is an act of dominion wrongfully asserted over another's property inconsistent with his ownership therein." *Edwards v. Landsman*, 51 So. 3d 1028, 1213 (Fla. 4th DCA 2011). In other words, "to state a claim for conversion, one must allege facts sufficient to show ownership of asserted dominion over that property." *Id.*

13

CASE NO. 2016-CA-010362-O
DIV. 39

Here, Universal offered no evidence that it owned any of the vehicles Westlake repossessed or to demonstrate Westlake's actions were inconsistent with its ownership rights. As stated under paragraph 16 of the LSA:

> Upon the occurrence of an Event of Default or if Vehicles or other Collateral are in danger of misuse, loss, seizure, or confiscation, Lender may, in its discretion, accelerate the entire outstanding amount due from Borrower under this Agreement and may take immediate possession of Vehicles or other Collateral without demand or further notice and without legal process. In furtherance thereof, Borrower shall, if Lender so requests, assemble Vehicles or other Collateral and make them available to Lender at a reasonable place designated by Lender, to enter upon the premises wherever the Vehicles and other Collateral may be and remove same.

Accordingly, the Court concludes Universal has failed to prove Westlake converted any of the vehicles by a preponderance of the evidence, or by substantial, competent evidence.

Universal's counterclaims also run afoul of Florida's Banking Statute of Frauds that prohibits a debtor from pursuing "an action on a credit agreement unless the agreement *is in writing, expresses consideration*, sets forth the relevant terms and conditions, *and is signed by the creditor and the debtor*." FLA. STAT. § 687.0304(2) (emphasis added). The term "credit agreement" is used broadly in this context to mean "an agreement to lend or forbear repayment of money, goods, or things in action, to otherwise extend credit, or to make any other financial accommodation." FLA. STAT. § 687.0304(1)(a). Section 687.0302 was enacted to "protect lenders from liability for actions or statements a lender might make in the context of counseling or negotiating with the borrower which the borrower construes as an agreement, the subsequent violation of which is actionable against the lender." *See Dixon v. Countrywide Home Loans, Inc.*, 710 F. Supp. 2d 1325, 1330 (S.D. Fla. 2010). Under section 687.0304, "an action for damages cannot be maintained on the ground of fraud in refusing to perform the contract, even though the defendant at the time of the making of the oral contract may have had no intention of performing

14

CASE NO. 2016-CA-010362-O
DIV. 39

it." *Attanasio v. Excel Dev. Corp.*, 757 So. 2d 1253, 1255 (Fla. 4th DCA 2000). "To hold otherwise would allow every failed breach of contract claim to morph into a negligent misrepresentation or FDUTPA claim." *Dixon*, 710 F. Supp. 2d at 1331.

### FINAL JUDGMENT

Based on the foregoing findings of fact and conclusions of law, it is hereby

**ORDERED AND ADJUDGED** that judgment is entered in favor of Plaintiff Westlake Flooring Company, LLC, on the causes of action stated in its Third Amended Complaint against Defendants Universal Auto Plaza, Inc., and Mehnroosh Sabeti-Sanat, and shall recover from them, jointly and severally, the sum of **$337,366.60**, that shall bear interest at the rate of **4.75%** per year, for which let execution issue forthwith.

It is further **ORDERED AND ADJUDGED** that judgment is entered in favor of Plaintiff Westlake Flooring Company, LLC on Defendant Universal Auto Plaza, Inc.'s counterclaims. Defendant shall recover nothing from Westlake and shall go hence without day with respect to the counterclaims.

It is further **ORDERED AND ADJUDGED** Westlake is the prevailing party in this matter and is entitled to its attorney's fees and costs pursuant to the LSA terms. The Court hereby retains jurisdiction to determine the reasonableness and amounts of attorney's fees and costs to be awarded.

It is hereby **ORDERED AND ADJUDGED** the Court shall retain jurisdiction to enter all orders necessary to enforce its rulings and judgment herein.

**DONE AND ORDERED** in Orange County, Florida on December 1, 2022.

*/s/ Vincent Falcone III*
eSigned by Vincent Falcone III  12/01/2022 16:21:58 Kg3zZgH2
HON. VINCENT FALCONE III
CIRCUIT COURT JUDGE

CASE NO. 2016-CA-010362-O
DIV. 39

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing was filed with the Clerk of the Court this 1st day of December, 2022 by using the Florida Courts E-Filing Portal System. Accordingly, a copy of the foregoing is being served on this day to all attorney(s)/interested parties identified on the ePortal Electronic Service List, via transmission of Notices of Electronic Filing generated by the ePortal System.

*[signature]*
eSigned by Vincent Falcone III  12/01/2022 16:21:58 Kg3zZgH2

Judge Vincent Falcone III

16